## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| GREGORY LOWE, | |
| *Plaintiff,* | Civil Action No.: |
| v. | 5:23-cv-00394-TES |
| ALLSTAR MOVING & DELIVERY, LLC and AMD OF MACON, INC., | |
| *Defendants.* | |

## DEFAULT JUDGMENT

Plaintiff Gregory Lowe filed this lawsuit on October 11, 2023. [Doc. 1]. On March 13, 2024, the Clerk of Court entered default against Defendants Allstar Moving & Delivery, LLC and AMD of Macon, Inc. On April 17, 2024, Plaintiff filed his Motion for Default Judgment and Brief in Support Thereof, which Plaintiff re-filed to address a deficiency the following day. [Doc. 15; Doc. 16]. Plaintiff supported his Motion with a Declaration of Plaintiff [Doc. 16-1], and on April 24, 2024, Plaintiff further supplemented his Motion with a Declaration of Counsel in Support of Award of Fees and Costs [Doc. 17]. The Court convened a hearing on April 25, 2024, during which Plaintiff offered additional testimony in support of his Motion. [*See* Doc. 18]. For the reasons that follow, the Court **GRANTS** Plaintiff's Motion for Default Judgment against both Defendants.

## I.    BACKGROUND

Defendants AMD of Macon, Inc. and Allstar Moving & Delivery, LLC provide residential and commercial moving services both locally and to various locations throughout the southeastern United States. [Doc. 1, ¶ 9; Doc. 16-1, ¶ 17]. During the period at issue, the year 2019, Defendants had an annual gross revenue of over $500,000.00, and Defendants employed in excess of fifteen people for at least twenty calendar weeks. [Doc. 1, ¶10; Doc. 16-1, ¶¶8-9].  Both Defendants share the same registered office and the owner of both Defendants, Dan Couey, also serves as each entities' registered agent. [Doc. 1, ¶4-6; Doc. 16-1, ¶ 10].  According to Lowe, during his employment, Defendants used the name of each corporate entity interchangeably, to the extent that Lowe was under the impression that he was an employee of both entities. [Doc. 16-1, ¶ 6].[1]

Lowe is a black male who is Muslim, meaning that he subscribes to the faith of Islam. [Doc. 1, ¶13; Doc. 16-1, ¶ 22].  After a brief stint working for Allstar Moving through a temporary staffing agency, Lowe became directly employed with Allstar Moving in May 2019 in the position of "Mover." [Doc. 1, ¶13; Doc. 16-1, ¶ 5]. Soon thereafter, Lowe observed racial disparities in the workplace, including the manner in which Allstar Moving treated its black customers and its employees. [*See* Doc. 16 at 3-4].

---

[1] Defendants Allstar Moving & Delivery, LLC and AMD of Macon, Inc. are hereinafter, collectively, referred to as "Allstar Moving" or "Defendants."

In the workplace, management was known to routinely make racially-inappropriate comments, including the owner's frequent use of the "N-word." [Doc. 1, ¶17; Doc. 16-1, ¶ 24]. During the hearing, Lowe testified that he personally observed this language, which was at times used towards him. Allstar Moving also routinely assigned its white employees to preferential jobs, and these assignments resulted in greater compensation and/or tips than the other jobs for which black employees were generally assigned. [Doc. 1, ¶21-23]. Couey would routinely comment that Allstar Moving's white employees were the ones doing all the hard work for the business. [*Id.*, ¶20].

As Lowe confirmed in his testimony, Allstar Moving would compensate its white movers at a rate of between $1.00 to $4.00 per hour more than its black employees, even though the employees had similar experience and had worked for the company for comparable periods of time. [Doc. 1, ¶¶18-19; Doc. 16-1, ¶ 40]. For example, while Lowe was paid $9.00 per hour for his work, his white colleagues with similar experience would generally earn between $10.00 to $13.00 per hour for performing the same types of work as Lowe. [Doc. 1, ¶19; Doc. 16-1, ¶ 40].

When Lowe began his employment, he did not disclose the fact that he was Muslim to anyone in the workplace. [Doc. 1, ¶29; Doc. 16-1, ¶ 22]. However, in summer 2019, Lowe's coworker, who was also a team lead, asked Lowe if he identified as Muslim after he observed Lowe greeting another person using a traditional Muslim greeting. [Doc. 1, ¶29; Doc. 16-1, ¶ 22]. Lowe explained that he did not normally share this

information with others because of his concern that others would respond with stereotypes and derogatory comments about his faith, but he confirmed at that time that he was indeed a believer of Islam. [*Id.*]. Soon thereafter, news of Lowe's religion quickly spread through the workplace, including to Allstar Moving's owner. [Doc. 1, ¶29; Doc. 16-1, ¶ 23]. Individuals began making comments in the workplace implicating Lowe's religion after this information was first disclosed, including a rumor that Lowe was a terrorist. [Doc. 1, ¶29].

Subsequently, Lowe would hear Allstar Moving's owner making between two and three negative comments about Islam per week. [Doc. 1, ¶32; Doc. 16-1, ¶ 24]. Indeed, some of Couey's comments simply referenced Lowe's faith, but were not themselves offensive. [*See, e.g.*, Doc. 1, ¶33 (suggesting that Lowe should work with another member of the local business community who was believed to be Muslim)]. However, Couey once attempted to convince Lowe to convert to Christianity, and Couey made veiled threats about what would happen to Lowe if he opted not to convert his religious beliefs. [Doc. 1, ¶35; Doc. 16-1, ¶ 26]. Couey also specifically referred to Lowe, as well as other members of the Muslim community, as a "terrorists. [Doc. 1, ¶34; Doc. 16-1, ¶ 26]. Couey made other comments suggesting that all believers of Islam were like the suicide bombers whom Couey had apparently seen on television. [Doc. 16-1, ¶ 26]. Couey told Lowe that his religion, Islam, was "made up." [Doc. 1, ¶9; Doc. 16-1, ¶ 17]. Couey not only made disparaging remarks about the prophet and founder of Islam, he would commonly refer

4

to Lowe by the name "Muhammed," which, of course, is not Lowe's name. [Doc. 1, ¶¶36-37; Doc. 16-1, ¶ 26]. As he explained in his Declaration and at the hearing, Lowe tried not to let the disparaging remarks about his religion bother him, including by reminding himself that Couey was the one cutting his paycheck. [*See also*, Doc. 16-1, ¶25].

Lowe testified that, on the afternoon of October 29, 2019, after he and his coworkers completed a moving job and collected the customer's money, they returned to Allstar Moving's office. [*See also* Doc. 1, ¶¶38-44; Doc. 16-1, ¶¶ 27-30]. When Lowe encountered Couey in the office, Couey initiated a conversation in which he insisted that the Quaran, the religious text of Islam, promoted hate and the killing of innocent people. [*Id.*]. Lowe tried to correct these comments and brush them aside when he told Couey in response that, if Couey could show him parts of the Quran that supported Couey's statements, then Lowe would give up his entire paycheck. [*Id.*]. Couey then doubled-down, telling Lowe that an internet search would support his position. [*Id.*]. Couey, who was beginning to get visibly angry, ultimately told Lowe, "I don't need your kind working for me. I don't want no Muslim working for me. Get the fuck out!" [*Id.*]. Even though there was a heavy downpour at the time, Couey advised Lowe to leave Allstar Moving's premises immediately. [*Id.*]. As Lowe confirmed in his testimony, several other employees observed this conversation. [*See also* Doc. 16-4, ¶¶6; Doc. 16-4, ¶¶7-8].

In the Separation Notice issued by the employer, Allstar Moving explicitly stated that Lowe was terminated for "disorderly conduct," that he had been "argumentative"

and "disrespectful," that Lowe had made "terroristic threats," and that he was not a "team player." [Doc. 1, ¶46; Doc. 16-1, ¶ 31].  Lowe denies these allegations, and he further notes that he was known in the workplace as a hard worker and good employee, and Couey had recently told Lowe that he had been doing a "good job." [Doc. 1, ¶47; Doc. 16-1, ¶ 32].  However, after Allstar Moving advised him to return to the workplace to pick up his final paycheck, Lowe was met with Couey holding a baseball bat, striking it into the palm of his hand in an apparently threatening manner, and Couey suggested that he would hit Lowe if Lowe did not immediately leave the premises after getting his paycheck. [Doc. 1, ¶48; Doc. 16-1, ¶ 33; *see also* Doc. 16-4, ¶7].

In addition to the financial impacts and consequences caused by Allstar Moving's termination of Lowe's employment, Lowe testified, both in his Declaration and during the aforementioned hearing, as to the humiliation, embarrassment, and concern for his safety that he experienced, and continues to feel today, both as a result of the circumstances underlying his termination and the other race- and religious-based treatment that Lowe experienced while employed with Allstar Moving. [*See also* Doc. 16-1, ¶¶34-39].

## II.    PROCEDURAL BACKGROUND

On December 3, 2019, Lowe filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been discriminated based on race and religion.  [Doc. 1, ¶49; Doc. 15-1, ¶12]. Allstar Moving

6

had notice of the proceedings before the EEOC, it participated in the EEOC's investigation of Lowe's claims, and Allstar Moving was represented by counsel during those proceedings. [Doc. 1, ¶50; Doc. 15-1, ¶13]. As a part of its investigation, the EEOC reviewed written submissions of both Lowe and Allstar Moving, statements submitted by witnesses, and the EEOC invited Lowe to participate in a virtual interview to further explore his allegations of discrimination based on race and religion. [Doc. 15-1, ¶14-16]. Ultimately, the EEOC issued a "Determination," finding that there was reasonable cause to support Lowe's allegations of racial and religious discrimination. [Doc. 1, ¶51; Doc. 15-1, ¶17]. After issuing its Determination, the EEOC invited the parties to attempt to resolve the Charge through a process called "Conciliation." [Doc. 15-1, ¶18]. However, Conciliation failed, and the EEOC issued Lowe a notice of his right to sue on July 13, 2023. (Doc. 1, ¶52; Doc. 15-1, ¶19.)

Lowe filed the instant civil action on October 11, 2023. [Doc. 15-1, ¶20; *see generally* Doc. 1.] On the same day that Lowe filed his Complaint, he sent a Notice of Lawsuit and Request to Waive Service to both Defendants, through counsel, via Certified Mail. [Doc. 4, ¶3]. Defendants failed to return any waiver of service. [*See* Doc. 12, ¶¶3-4]. Lowe subsequently attempted, but failed, to have representatives of the Bibb County Sheriff's Office serve Defendants with process. [*See* Doc. 12, ¶¶3-7 (citations omitted)]. Ultimately, at Lowe's request, the Georgia Secretary of State ultimately acknowledged service on behalf of Defendants as their statutory agent as of February 19, 2024. [*Id.*].

After Defendants failed to file a responsive pleading, Lowe applied for entry of default on March 12, 2024. [*See generally* Doc. 12].  The Clerk of Court entered Default against both Defendants the following day, and further advised Lowe of his deadline to file his motion for summary judgment. The Court subsequently granted Lowe's request to extend his time to file that motion. [Doc. 13; Doc. 14].  On April 17, 2024, Lowe filed his Motion for Default Judgment, which was re-filed the following day to correct a deficiency. [Doc. 15; Doc. 16].  On April 25, 2024, the Court convened a hearing on Lowe's Motion for which Lowe and his counsel appeared. [*See* Doc. 18].  Defendants did not appear for the April 25, 2024 hearing. [*See id.*].

To date, neither Defendant has made any filings with this Court or otherwise participated in any proceedings.  Similarly, neither Defendant has made any attempt to set aside default.

### III.    LEGAL STANDARD

A default under Fed. R. Civ. P. 55(a) constitutes admission of all well-pleaded factual allegations contained in the complaint and "severely limits the defendant's ability to defend the action." *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007); *Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). The defendant, however, "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Tyco Fire & Sec.*, 218 F. App'x at 863. Thus, pursuant to Rule 55(b)(2), a grant of default judgment in favor of the plaintiff is warranted only if the allegations in

8

the complaint state a substantive cause of action and there exists a sufficient basis in the pleadings for the judgment entered. *Id.*; *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005); *Frazier v. Absolute Collection Serv., Inc.*, 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011); *Nishimatsu Constr. Co., Ltd.*, 515 F.2d at 1206. The legal standard on a motion for entry of default judgment is "akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrance Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (internal citation omitted). A motion for default judgment is therefore "like a reverse motion to dismiss for failure to state a claim." *Id.* (citing *Wooten v. McDonald Transit Assocs., Inc.*, 775 F.3d 689, 695 (5th Cir. 2015)).

In addition to the pleadings, a court considering a motion for default judgment may also rely on evidence such as affidavits and declarations. *Id.* An "evidentiary hearing is not a per se requirement" for a default judgment and is not needed when "all essential evidence is already of record." *SEC v. Smyth*, 420 F.3d 1225, 1232 n. 13 (11th Cir. 2005). Ultimately, the entry of a default judgment is committed to the discretion of the district court. *Hamm v. Dekalb Cnty.*, 774 F.2d 1567, 1576 (11th Cir. 1985).

## IV.    ANALYSIS

Based on the well-plead factual allegations in Lowe's Complaint, as well as the additional written and in-person testimony offered by Lowe in support of his claims. The Court finds that Lowe is entitled to default judgment on all of his claims against Allstar Moving.

As a preliminary matter, the Court finds that Lowe's Complaint adequately sets forth his claims upon which relief may be granted and Lowe has exhausted his administrative remedies. "[A] default judgment cannot stand on a complaint that fails to state a claim." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 n.41 (11th Cir. 1997) (citing *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Therefore, when considering a motion for default judgment, a court must investigate the legal sufficiency of the allegations and ensure the complaint states a plausible claim for relief. *See Surtain*, 789 F.3d at 1245 ("Conceptually ... a motion for default judgment is like a reverse motion to dismiss for failure to state a claim."). As discussed below, Lowe's Complaint adequately sets forth claims for religious and racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

Critically, it is also apparent that Lowe exhausted his administrative remedies as to his Title VII claims.[2]   *See Marshall v. Tidal Wave Response, LLC*, 649 F. Supp. 3d 1299, 1305 (N.D. Ga. 2022) (citing *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999); *Bloodworth v. Colvin*, 17 F. Supp. 3d 1245, 1250 (N.D. Ga. 2014).) "Prior to filing a Title VII action, however, a plaintiff first must file a charge of discrimination with the EEOC." *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citing *Sanchez*

---

[2] Unlike Lowe's Title VII claims, the claim set forth in "Count II" – racial discrimination in violation of Section 1981 – does not have an administrative exhaustion requirement.

*v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970)); *see also* 42 U.S.C. § 2000e-5. When determining whether that purpose has been served, the Eleventh Circuit has taken a practical, substance-over-form approach. *See, e.g., Gregory*, 355 F.3d at 1279; *Batson v. Salvation Army*, 897 F.3d 1320 (11th Cir. 2018). Thus, the scope of an EEOC charge should not be "strictly interpreted." *Sanchez*, 431 F.2d at 465. As a result, "judicial claims are allowed if they "'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, [although] allegations of *new acts of discrimination are inappropriate.*" 355 F.3d at 1279-80 (citation omitted).

Indeed, before pursuing the instant litigation, Lowe filed his Charge with the EEOC, and the allegations Lowe made therein concerning racial and religious discrimination were nearly identical to the claims brought in this judicial action. [*Compare* Doc. 16-2, *with* Doc. 1, ¶¶3-48]. After filing his Charge, an investigation ensued that also involved the same subject matter as Lowe's Charge and the claims set forth in this litigation. [*See generally* Doc. 16-3]. Moreover, Allstar Moving had notice of Lowe's EEOC Charge, participated in the EEOC proceedings, and was represented by counsel at that time. [Doc. 1, ¶50]. The fact that the EEOC's Determination also mirrors the claims in this action supports the fact that Lowe exhausted his administrative remedies. [*See generally* Doc. 16-5]. Further, Lowe has established that the EEOC issued a notice of his right to sue [*see generally* Doc. 16-6], and that Lowe filed this civil action within 90 days of the EEOC's issuance of the same [*see generally* Doc. 1].

Accordingly, the Court finds that Lowe's Complaint sufficiently sets forth claims for race- and religious-based discrimination in violation of Title VII and Section 1981, and that Lowe exhausted his administrative remedies as to his Title VII claims prior to bringing suit.

## A. Racial Discrimination in Violation of Title VII and Section 1981

Lowe is entitled to default judgment on his claims for discrimination based on race in violation of Title VII and Section 1981 (Counts I and II). "Section 1981 'affords a federal remedy against discrimination in private employment on the basis of race.'" *Brown v. Ramada Birmingham Airport*, No. 2:17-cv-01671-RDP, 2018 WL 1609632, at *2 (N.D. Ala. April 3, 2018) (quoting *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 459-60 (1975)). Claims for race discrimination under Title VII and 42 U.S.C. § 1981 are analyzed under the same case law and framework. *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir. 2000); *James v. City of Montgomery*, 823 F. App'x 728, 732 (11th Cir. 2020).

For the purposes of default judgment, "a complaint need only 'provide enough factual matter (taken as true) to suggest intentional race discrimination.'" *Surtain*, 789 F.3d at 1246 (quoting *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). "The complaint 'need not allege facts sufficient to make out a *McDonnell Douglas* prima facie case.'" *Id.* (*quoting Davis*, 516 F.3d at 974); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "This

is because *McDonnell Douglas'* burden-shifting framework is an evidentiary standard, not a pleading requirement." *Id.* (citing *Swierkiewicz*, 534 U.S. at 510).

However, under the *McDonnell Douglas* approach, a plaintiff may make out a *prima facie* case of discrimination by showing: (1) membership in a protected class; (2) qualification for the position held; (3) adverse employment action; and (4) that he was treated less favorably than someone similarly situated outside of his protected class. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000).

Lowe has established that Allstar Moving discriminated against Lowe and its other black employees with respect to their compensation.[3] In addition to his allegations that specifically support his pay discrimination claims, Lowe has provided sufficient allegations to support an inference of racially discriminatory animus within Allstar Moving's workplace, including Allstar Moving's treatment of its customers and the routine use of racially-inappropriate comments made toward and about customers and employees, including the routine use of the "N-Word." [*See* Doc. 1, ¶¶15-17]. Lowe also established that Allstar Moving gave its white employees preferential and more lucrative assignments, as well as the use of better and safer vehicles and equipment, over their black counterparts in the same positions. [*Id.*, ¶¶21-26]. Moreover, when employees

---

[3] Based on the well-pled allegations and other evidence submitted, Lowe presumably could have established that he was subjected to harassment based on race, but Lowe confirmed during the hearing that his racial discrimination claims are limited to his compensation.

questioned Allstar Moving's management concerning discrepancies in pay, Couey would justify the differences in compensation by responding that the white employees did all of the hard work for Allstar Moving, and they deserved better pay because white employees were smarter, more intelligent, and "patriots." [*Id.*, ¶20, 26]. In addition to the analysis of Lowe's pay discrimination claim under *McDonnell Douglas* below, these allegations plausibly suggest that Allstar Moving intentionally discriminated against Lowe based on his race with respect to his compensation in violation of Section 1981. *See Surtain*, 789 F.3d at 1246.

Lowe's pay discrimination claim prevails under the *McDonnell Douglas* framework. *See Joe's Stone Crab, Inc.*, 220 F.3d at 1286. Lowe, as a black or African American man, is a member of a protected class. [*See* Doc. 1, ¶13]. Lowe was qualified for the position of "mover," not only because he had been working successfully for Allstar Moving for several months, both as a temp and as a full-time employee, but because he did well in his job and was often commended for his work by both customers and Couey alike. [*See id.*, ¶28; Doc. 16-1, ¶32].

As he alleged, Allstar Moving compensated Lowe with an hourly wage of $9.00 per hour, while movers with the same skills and experience who were white generally made between $10.00 and $13.00. [Doc. 1, ¶19; *see also* Doc. 16-1, ¶40]. The admitted allegations also reflect that Allstar Moving discriminated based on race with respect to other terms and conditions of employment, other than just the rates of pay. [*Id.*, ¶¶21-27].

These allegations are further bolstered by one of Lowe's black coworkers, Demareyea Jackson, who testified that black movers were often assigned less than half of the hours per week as their similarly-situated white colleagues. [Doc. 16-4, ¶43]. As a result, Allstar Moving subjected Lowe to discrimination based on his race with respect to his terms, conditions, or privileges of his employment, and specifically his pay. *See* 42 U.S.C. § 2000e-2(a). And as discussed herein, and further bolstered by the testimony presented during the hearing, Lowe has established that he was treated less favorably than the Allstar Moving employees outside of Lowe's protected class, specifically the white movers.

Based on the well-pled allegations contained in the Complaint, along with the additional evidence presented, Lowe is entitled to default judgment against Allstar Moving on his claims for discrimination based on race with respect to his compensation in violation of Title VII (Count I) and Section 1981 (Count II). The Court will address the issue of damages below.

### B. Discrimination Based on Religion in Violation of Title VII

Lowe has established that his employment with Allstar Moving was terminated based on his religion, and he is therefore entitled to default judgment on his claim for discrimination in violation of Title VII (Count III). In addition to proving a claim with circumstantial evidence using the *McDonnell Douglas* framework discussed above, a Title VII claimant may also prove discrimination based on direct evidence. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023). "Direct evidence is 'evidence, which if believed, proves existence of a fact in issue without inference or presumption.'" *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). Regardless of the specific framework, the question ultimately is "whether the evidence permits a reasonable factfinder to find that the employer [discriminated] against the employee." *Berry*, 84 F.4th at 1311.

Lowe has established on default judgment that he was discriminated against based on his religion through the use of direct evidence. Allstar Moving's discriminatory intent is otherwise supported by the derogatory remarks made in the workplace, particularly by the owner of Allstar Moving, specifically about Lowe's religious beliefs. *See Marshall*, 649 F. Supp. 3d at 1307 ("… it is well settled in this Circuit that the use of racial slurs is direct evidence of a defendant's discriminatory intent.") (citing *Kinnon v. Arcoub, Gopman & Assoc., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997)).

Soon after it became known in the workplace that Lowe was Muslim, Allstar Moving's employees began discussing rumors that Lowe was a terrorist. [Doc. 1, ¶29; Doc. 16-1, ¶26]. Subsequently, Allstar Moving's owner began making disparaging comments about Islam on a near-daily basis. [Doc. 1, ¶32; Doc. 16-1, ¶24]. Couey not only

16

made derogatory comments about the founder and profit of Islam, he would refer to Lowe, himself, as "Muhammad," even though Couey was aware that was not Lowe's name. [Doc. 1, ¶¶37; Doc. 16-1, ¶26]. Allstar Moving's owner even tried to get Lowe to convert to Christianity, and he suggested that Lowe should be scared, for some unstated reason, if he chose not to do so. [Doc. 1, ¶35; Doc. 16-1, ¶26]. Couey tried to suggest that all Muslims were like the suicide bombers that Couey had apparently seen on TV. [Doc. 16-1, ¶26]. Allstar Moving's owner further demeaned the Islamic faith by telling Lowe that it was a "made-up" religion. [Doc. 1, ¶36; Doc. 16-1, ¶26]. These were all comments that Lowe testified that he found deeply offensive and disturbing, a feeling that Lowe continues to carry today. [*See* Doc. 16-1, ¶¶34-35, 38].

Notwithstanding whether the aforementioned comments constitute sufficient direct evidence to support Lowe's religious discrimination claim, the circumstances underlying Allstar Moving's termination of Lowe certainly provide additional support. As discussed herein, Lowe was terminated after Allstar Moving's owner insisted that Lowe's faith, and specifically its religious text, promoted hate and the killing of innocent people. [Doc. 1, ¶¶38-42; Doc. 16-1, ¶28-29]. Immediately after Couey made those comments and as Lowe was about to be fired, Couey told Lowe, "I don't need your kind working for me..." [Doc. 16-1, ¶29]. Even more directly, Couey added angrily, "... I don't want no Muslim working for me. Get the fuck out!" [*Id.* (emphasis added); *see also* Doc. 1, ¶¶43]. Lowe was then told to leave the premises immediately into a rainstorm. [Doc.

17

1, ¶45; Doc. 16-1, ¶30]. Based on the well-pled allegations and additional evidence submitted, the Court does not have to make any inference or presumption to determine that the owner of Allstar Moving[4] fired Lowe specifically because of his religious beliefs. *See Jones, LLC,* 854 F.3d at 1270; *Burrell,* 125 F.3d at 1393; *Rollins,* 833 F.2d at 1528 n.6. Accordingly, Lowe is entitled to default judgment on his claim that he was discriminated against in violation of Title VII when his employment was terminated explicitly based on Lowe's religion, and the Court will address the issue of damages below.

## C. Damages

Having prevailed on his claims for religious and racial discrimination, Lowe is also entitled to an award of back pay and interest. With specific regard to Lowe's pay discrimination claims based on race in violation of Title VII and Section 1981, Lowe testified, both in his Declaration and at the hearing, that he was paid between $1.00 and $4.00 per hour less than his similarly-situated white counterparts from May 16, 2019 through his October 29, 2019 termination, during which time Lowe worked approximately 900 regular hours and 300 overtime hours. [*See* Doc. 16-1, ¶40]. Using the average of Lowe's estimated difference in pay, on Counts I and II, Lowe is entitled to an award of backpay in the amount of $3,375.00, plus applicable interest.

---

[4] Given that Dan Couey is the owner, the final decisionmaker on employment matters, and the person specifically responsible for the conduct at issue, Allstar Moving may be held directly liable for the discriminatory treatment for which Lowe was subjected.

Lowe is also entitled to an award of backpay on Count III. According to Lowe, on average, he was compensated $468.70 per week during his employment with Allstar Moving. At his rate of $9.00 per hour, this average weekly pay would consist of 40 hours paid at a regular rate, and an additional 12 hours on average of pay at the overtime rate. However, but for the pay discrimination addressed herein, Lowe should have been paid approximately $11.00 per hour for his regular rate, and an overtime rate of $16.50 per hour, or a total of $638.00 on average per week. Indeed, Lowe was occasionally able to secure other employment, largely through temporary staffing agencies from the time of his October 29, 2019 termination to the present; but because this employment was at times sporadic, the Court finds that an award of back pay for a period of two years (104 weeks) following Lowe's termination is reasonable and supported by the evidence. Accordingly, on Count III, Lowe is entitled to an award of backpay in the amount of $66,352.00, plus interest at the applicable rate.

Lowe is further entitled to an award of compensatory and punitive damages on all of his claims. On Count II, under Section 1981, Mr. Lowe must come forward with "substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights." *Marshall*, 649 F. Supp. 3d at 1310-11 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002)); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-37(1999)). In this context, "[m]alice means an intent to harm and recklessness means serious disregard for the consequences of one's actions." *Id.* (quoting

*Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900 (11th Cir. 2011)); *see also EEOC v. W & O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000)). Punitive damages are available only if "the discriminating employee was high up the corporate hierarchy or ... higher management countenanced or approved his behavior." *Id.; see also Miller*, 277 F.3d at 1280. Here, the sole owner of Allstar Moving, the person ultimately responsible for its day-to-day operation and the highest person in the corporate hierarchy, was the one responsible for the racially discriminatory pay practices. Upon a review of the facts, it is also apparent that Couey's conduct was intentional and that he showed no regard for the consequences of his pay discrimination. Accordingly, Lowe is entitled to punitive damages on his Section 1981 pay discrimination claim (Count II).

Lowe is also entitled to compensatory and punitive damages on his pay discrimination claim (Count I) and that he was terminated based on his religion (Count III), both in violation of Title VII. Punitive damages are available when "the complaining party demonstrates that the [defendant] engaged in discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b). For the reasons discussed herein, Allstar Moving acted with malice and reckless indifference to Lowe's federally-protected rights with regard to the conduct underlying these Title VII claims.

Lowe has presented sufficient evidence to show that he incurred significant pain and suffering and consequential damages with regard to Allstar Moving's pay

20

discrimination and discriminatory termination. For example, five years after he was fired, Lowe continues to experience significant distress due to the events at issue. [*See, e.g.*, Doc. 16-1, ¶¶34-35, 38]. The financial instability caused by the loss of Lowe's job also resulted in Lowe losing his home, which made it even more challenging for Lowe to secure and keep subsequent employment or to attend his weekly religious services. (*See id.*, ¶¶36-37.) The conduct at issue also continues to cause Lowe to feel concerns for his physical safety. (*See id.*, ¶39.) Based on the well-pled allegations and additional evidence presented, the Court concludes that Lowe's is entitled specifically to compensatory damages valued far in excess of the statutory cap for an employer with fewer than 101 employees. *See* 42 U.S.C. § 1981a(b)(3)(A). Accordingly, the Court awards both compensatory and punitive damages on all of Lowe's claims in the total amount of $50,000.00.

Finally, having prevailed on all of his claims, Lowe is entitled to an award of reasonable attorney's fees and costs of litigation[5] pursuant to 42 U.S.C. § 2000e-5(k). The Court calculates reasonable attorneys' fees under the lodestar method, which multiplies "the reasonable hours spent on the case and a reasonable hourly rate." *Harris v. Sam's E., Inc.*, 4:20-CV-176 (CDL), 2023 WL 2163918, at *3 (M.D. Ga. Feb. 22, 2023) (quoting *In re*

---

[5] While the applicable statute does not address costs, courts within the Eleventh Circuit have routinely found that expenses related to litigation are also recoverable as a part of an award of attorney's fees under Title VII. *See, e.g., Evans v. Books-A-Million*, 762 F.3d 1288, 1298–99 (11th Cir. 2014); *Johnson v. Univ. Coll. of Univ. of Alab. in Birmingham*, 706 F.2d 1205, 1209 (11th Cir. 1983).

*Home Depot Inc.*, 931 F.3d 1065, 1076 (11th Cir. 2019)). "There is a strong presumption that the lodestar yields a reasonable fee[.]" *Id.* (quoting *In re Home Depot Inc.*, 931 F.3d at 1082). "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates," but the Court may also exercise its own expertise as to the fee's reasonableness. *Id.* (quoting *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988)).

Lowe has presented evidence of his attorney's fees and costs through a declaration submitted by counsel. [*See generally* Doc. 17]. At the time of the hearing, Lowe's counsel had spent approximately 86.10 hours on this case. [Doc. 17, ¶18 (citing Doc. 17-1 at 50)]. The hourly rates of Lowe's counsel's legal staff range from $95.00 to $140.00 per hour, while his attorneys billed at rates between $140.00 and $300.00 per hour. [*Id.*, ¶11]. Moreover, Lowe's counsel testified that "[t]hese rates are consistent with the market area" in Middle Georgia. [*Id.*, ¶12; *see also id.*, ¶¶13-14]. In all, Lowe seeks a total of $16,120.53, consisting of $15,480.50 in attorney's fees and $640.03 in costs of litigation. [*Id.*, ¶¶18-20]. Based on the evidence and the Court's knowledge and experience of reasonable hourly rates in the relevant area, the Court finds that the fees and expenses Lowe incurred were reasonable. Accordingly, Lowe is entitled to an award of $16,120.53 on all of his claims for attorney's fees and costs of litigation.

## V.    CONCLUSION

For the above and foregoing reasons, Plaintiff Gregory Lowe's Motion for Default

Judgment [Doc. 16] is **GRANTED** as to Defendants Allstar Moving & Delivery, LLC and AMD of Macon, Inc., for which said Defendants are jointly liable.  Accordingly, Plaintiff is entitled to default judgment in his favor, and he is awarded damages and attorney's fees and costs in the amounts that follow:

a)  On Counts I and II, Plaintiff is awarded back pay in the amount of $3,375.00 plus prejudgment and postjudgment interest pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. ¶1981;

b)  On Count III, Plaintiff is awarded back pay in the amount of $66,352.00 plus prejudgment and postjudgment interest pursuant to Title VII of the Civil Rights Act of 1964;

c)   Plaintiff is entitled to compensatory and punitive damages in the total amount of $50,000.00 on all claims pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. ¶1981; and,

d)  Plaintiff is entitled to an award of reasonable attorney's fees and costs of litigation on all claims in the total amount of $16,120.53.

**SO ORDERED**, this ___ day of May, 2024.

TILMAN E. SELF, III, JUDGE
UNITED STATES DISTRICT COURT

ORDER PREPARED BY:
/s/ Kenneth E. Barton III
KENNETH E. BARTON III

Georgia Bar No. 301171
COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com